IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GARY DWAYNE SILVA,

          Petitioner,

v.                                     CIV 08-0431 WJ/KBM

ERASMO BRAVO, et al.,

          Respondents.

# PROPOSED FINDINGS
## &
## RECOMMENDED DISPOSITION

This matter is before the Court on Gary Dwayne Silva's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Because he filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case. *E.g., Abdul-Kabir v. Quarterman,* 550 U.S. 233, ___, 127 S. Ct. 1654, 1664 (2007); *DeLozier v. Sirmons,* 531 F.3d 1306, 1319 (10th Cir. 2008). All of the issues can be resolved on the record before me and, therefore, an evidentiary hearing is unnecessary. *E.g., Schriro v. Landrigan,* 550 U.S. 465, ___, 127 S. Ct. 1933, 1940 (2007)*; Sandoval v. Ulibarri,* 548 F.3d 902, 915-16 (10th Cir.

2008); Rule 8(a), RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS.  I recommend that Silva's claims be denied as without merit and that this action be dismissed with prejudice.

A quick note on citations follows.  Respondents were ordered to expand the record and provided an electronic copy of the grand jury proceedings, the available transcripts, and the State "Record Proper."  *See Docs. 14, 17, 19, 20, 22.*  Some of the documents in the Record Proper duplicate the Exhibits Respondents submitted with their Answer.  *See Doc. 13.*  For ease of reference, I will cite documents by the Record Proper Bates-stamp number.  If a document does not appear in the Record Proper, I will cite the Exhibit in Respondent's Answer.

# I.  Background

In this case, the victim of a brutal attempted murder survived to testify about her ordeal in chilling detail.  The background involves rival motorcycle gangs and a "shoot out" involving Silva, and a web of people connected through drugs and motorcycle gang affiliations.  Silva and four others were indicted for kidnapping, aggravated assault, attempted murder, tampering with evidence, and other various counts.  *See, e.g., Grand Jury Audio CD 9/30/02* (presentation of the charges against all five targets and testimony of detective).

The victim's testimony in a nutshell was that she found Silva's wallet soon after they met.  When she tried to return it, Silva and others shot at her, bound her hands, tied her to a chair, and held her because Silva thought she was a "rat" or "snitch."  They handed her over to "Gambler" – the person with whom Silva initiated contact.  Gambler drove the victim to a  remote area in the East Mountains, stabbed her several times, slit her throat with a knife, and left her for dead.  She managed to move herself to the road and run.  An officer with the Sheriff's Department happened upon her lying in the middle of the road.  She managed to tell him the names of the people involved and where to find them, including Silva, before the ambulance arrived and took her to the hospital.  *See Trial Transcript 6/7/04* at 26-70 (victim's testimony); *see also id.* at 80-84 (testimony of officer who found victim lying in the road).  The subsequent investigation revealed evidence that corroborated what the victim told the officer that night and after her surgery, including the testimony at trial by one of the co-defendants.  *See id.* at 79-113 (officers' testimony); *Trial Transcript 6/8/04* at 7-41 (co-defendant and officers' testimony).

Silva was the sole defense witness at trial.  *See Trial Transcript 6/8/04* at 42-78.  Among other things, he testified that he and the victim had an altercation over the wallet, and that he fired a shot into the ground, not at her.  Frightened

3

that he was in trouble with a motorcycle gang, Silva made some telephone calls to one of the co-defendants.  She told him the victim's father would be notified and someone would be dispatched to pick up the victim.  Silva, the victim, and others proceeded to get high and then Silva left.  *Id.* at 58-66.

The jury found Silva guilty of all six counts – kidnapping, aggravated assault, tampering with evidence, and conspiracy to do the same.  *See, e.g., Trial Transcript 6/9/04* at 2-5 (jury verdict and poll); *Record Proper* at 2-4 (indictment); *id.* at 136-144 (jury verdict); *id.* at 145-63 (jury instructions); *id.* at 164-65 (record of trial).  After the verdict, the prosecution asked the trial just to "aggravate" the mandatory kidnapping sentence of eighteen years by six more years under N.M. Stat. § 31-18-15.1(C).  It argued as aggravating "facts" that Silva's motivation to silence a person he believed was a "rat" and his lack of remorse. With a six-year aggravation penalty added, Silva's total sentence would be forty years incarceration.  *See Record Proper* at 174-78.[1]

The trial judge agreed.  He originally sentenced Silva to forty years, stating that "based on the totality of what happened and based on the lack of remorse, based upon the testimony that I heard at trial [from Silva] that was clearly not in

---

[1]  At the sentencing hearing, the prosecution argued the same facts but characterized them as "premeditation" and "lack of remorse."  *See Sentencing Transcript 9/1/04* at 7-9.

line with any of the other witnesses, [I find] that aggravation is appropriate."
*Sentencing Transcript 9/1/04* at 10; *see also, e.g., id.* at 11 ("All of those counts will
run consecutively for 40 years in the State Penitentiary of New Mexico followed by
two years of mandatory parole."); *Record Proper* at 182 ("The actual term to be
served is:  40 years").[2]  The Court of Appeals affirmed the conviction after rejecting
sufficiency of the evidence and speedy trial claims.  It reversed on the imposition of
six-year aggravated sentence, holding that a jury, rather than the judge, had to find
the facts that warranted the aggravated sentence in the wake of *Apprendi* and
*Blakely.  See Record Proper* at 253 (citing New Mexico Court of Appeals' decision in
*State v. Frawley,* 137 N.M. 18, 106 P.3d 580 (Ct. App. 2005), *cert. denied,* 137 N.M.
265, 110 P.3d 73 (2005) (and subsequent history omitted)); *see also Blakely v.
Washington,* 542 U.S. 296 (2004); *Apprendi v. New Jersey,* 530 U.S. 466 (2000).

Whether the *Apprendi/Blakely/Frawley* rationale of the Court of Appeals was
controlling remained a question during the direct appeal and state post-conviction

---

[2]  The trial judge also originally imposed a firearm enhancement to the conspiracy to
commit aggravated assault charge, but soon after the original sentence was imposed, the parties
stipulated that was incorrect, and it was removed.  *See Record Proper* at 181, 211.  This was a
clerical error on the sentencing sheet, but did not affect the sentence imposed.  *Compare id.* at
180 (sentencing sheet indicating sentence of 18 months for Count 3 for aggravated assault was
enhanced one year for a firearm, and identical sentence for Count 4, conspiracy for same), *with
Sentencing Transcript 9/1/04* at 10 (imposing "18 plus 1 for the firearm" for Count 3 but only "18
months" on Count 4).

proceedings that included counseled motions and a *pro se* motion for a writ of mandamus.  Eventually, the question was settled and the six-year aggravated sentence was deleted on March 11, 2008, before the federal habeas petition was filed.  In the interim, Silva also filed a *pro se* state habeas petition, which the trial judge summarily denied.[3]

## II.  AEDPA Standards Of Review

Under AEDPA standards, if a state court addresses a claim on the merits, a federal court cannot grant an "application for a writ of habeas corpus" unless the State decision was (1) "contrary to" or an "unreasonable application" of "clearly established" Supreme Court precedent or (2) an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The Supreme Court and Tenth Circuit have discussed these

---

[3]  *See, e.g. Motion To Resentence Transcript 6/8/06* at 2-4 (declining to remove aggravation sentence); *Record Proper* at 244-45 (counseled motion to resentence); *id.* at 273-78 (*pro se* state habeas petition); *id.* at 342 (order summarily denying state habeas petition); *id.* at 346-51 (counseled motion to remove aggravation sentence after conclusion of state post-conviction proceedings and Supreme Court and New Mexico Supreme Court decisions concluding the issue in *State v. Frawley,* 143 N.M. 7, 172 P.3d 144 (N.M. 2007)); *id.* at 370-448 (*pro se* writ for mandamus); *id.* at 450 (trial judge decision denying writ of mandamus "however, the aggravation will be eliminated from the Petitioner's J&S.  NO sentencing hearing will be held."); *id.* at 455-58 (amended judgment entered March 11, 2008, eliminating the six-year aggravation for the kidnapping count and imposing a total of 34 years incarceration, approved by prosecutor and "Appellate Counsel for Defendant"); *Doc. 1* at 1, 35 (federal habeas petition signed April 24, 2008 and filed April 28, 2008).

deferential AEDPA standards in detail in many opinions, and I will not reiterate them here.[4]  These standards apply to decisions on the merits regardless of whether the State opinion is conclusory.

Furthermore, even if a federal habeas court finds that the State court decision was "contrary to" or "unreasonable" and a violation of constitutional dimension, habeas relief may not issue unless the violation is of a sort that warrants such relief.  *E.g., Terry Williams v. Taylor,* 529 U.S. 362, 375 (2000) ("It is, of course, well settled that the fact that constitutional error occurred in the proceedings that led to a state-court conviction may not alone be sufficient reason for concluding that a prisoner is entitled to the remedy of habeas."); *Wilson v. Sirmons,* 536 F.3d 1064, 1073 (10th Cir. 2008) ("If we find that the state court erred, we still must determine whether the error is a structural defect 'in the constitution of the trial mechanism, which def[ies] analysis by "harmless-error" standards.'") (quoting *Arizona v. Fulminante,* 449 U.S. 279, 309 (1991)), *rehearing en banc granted on separate issue,* 549 F.3d 1267 (10th Cir. 2008).  Finally, when a

---

[4]  *E.g., Panetti v. Quarterman,* ___ U.S. ___, 127 S. Ct. 2842, 2858-59 (2007) (and cases cited therein); *Fry v. Pliler,* 551 U.S. 112, ___, 127 S. Ct. 2321, 2326-27 (2007) (same); *Wilson v. Sirmons,* 536 F.3d 1064, 1073-74 (10th Cir. 2008), *rehearing en banc granted on separate issue,* 549 F.3d 1267 (10th Cir. 2008); *House v. Hatch,* 527 F.3d 1010, 1018-20 (10th Cir. 2008), *petition for cert. filed 10/14/08; DeLozier,* 531 F.3d at 1319; *Johnson v. Mullin,* 505 F.3d 1128, 1133-34 (10th Cir. 2007), *cert. denied,* 128 S. Ct. 2933 (2008).

claim that is raised for the first time in federal habeas is "easily resolvable against the habeas petitioner," the court may deny the claim on the merits.  *E.g., Lambrix v. Singletary,* 520 U.S. 518, 525 (1997); 28 U.S.C. § 2254(b)(2).  Some of the claims fall into the unexhausted category, but they are easily resolved.

# III.  Analysis

Silva raises twenty-one separately-numbered claims that interrelate and overlap.  I have construed them liberally, arranged them topically, and categorize and analyze them under the proper legal theories based on the facts he asserts.  *See, e.g., Roman-Nose v. New Mexico Dept. of Human Servs.,* 967 F.2d 435, 437 (10th Cir. 1992) ("The characterization of the action and the claim for relief by a *pro se* litigant is not dispositive on the availability of relief in federal court."); *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991) ("A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers.").

## A.  Noncognizable Claims

Some of Silva's claims allege a violation of the New Mexico Constitution.  *See Doc. 1* at 4-5 (Claim 3); *id.* at 5-6 (part of Claim 4); *id.* at 21 (part of Claim 14); *id.* at 22 (Claim 15); *id.* at 22-23 (part of Claim 16); *id.* at 23-25 (part of Claim 17);

*id.* at 28-30 (part of Claim 20).  Others allege a violation of state codes of conduct

for judges and attorneys.  *See id.* at 15-19 (Claim 11); *id.* at 20-21 (Claim 13); *id.* at

28-30 (Claim 20).  Other claims either allege a violation of Federal Criminal Rule

23, *see id.* at 8-9 (Claim 6); *id.* at 26-28 (part of Claim 19), or state rules, *see id.* at

26-28 (part of Claim 19); *id.* at 28-30 (part of Claim 20); *id.* at 30-31 (part of Claim

21).  Yet others relate to the state post-conviction proceedings – complaining of a

failure to hold an evidentiary hearing, failure to give "full review," and failure to

provide him transcripts.  *See id.* at 23-28 (Claims 17-19).  None of them are

cognizable in federal habeas.

> The Supreme Court has "stated many times that 'federal habeas corpus relief

does not lie for errors of state law.'"  *Estelle v. McGuire,* 502 U.S. 62, 67 (1991)

(quoting *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990), and also citing *Pulley v. Harris,*

465 U.S. 37, 41 (1984)); *see also, e.g., Montez v. McKinna*, 208 F.3d 862, 865 (10th

Cir. 2000) ("state law violations are not cognizable in a federal habeas action").  It

emphasizes that "it is not the province of a federal habeas court to reexamine

state-court determinations on state-law questions," *Estelle,* 502 U.S. at 67-68, and

that in "conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States," *id.* at

68.  Thus, the state constitutional claims should be dismissed.

State codes of judicial and attorney conduct fall into this category –
violations of a state code of conduct does not establish a constitutional violation.
*See Nix v. Whiteside,* 475 U.S. 157, 165 (1986) ("Under the *Strickland* standard,
breach of an ethical standard does not necessarily make out a denial of the Sixth
Amendment guarantee of assistance of counsel."); *Strickland v. Washington,* 466
U.S. 668, 688-89 (1984) ("Prevailing norms of practice as reflected in American
Bar Association standards and the like . . . are guides to determining what is
reasonable, but they are only guides. . . .  the purpose of the effective assistance
guarantee of the Sixth Amendment is not to improve the quality of legal
representation . . .  The purpose is simply to ensure that criminal defendants
receive a fair trial."); *Ives v. Boone,* 101 Fed. App'x 274, 295 (10th Cir.) ("we are not
free to grant Mr. Ives habeas relief simply because his appellate counsel was
disciplined by the Oklahoma State Bar."), *cert. denied,* 543 U.S. 1001, *and cert.
denied,* 543 U.S. 1026 (2004); *McPherson v. Miers,* 7 Fed. App'x 845, 849 (10th Cir.
2001) ("With regard to Mr. McPherson's judicial misconduct claim, the district
court correctly ruled that alleged violations of state codes of conduct are not
cognizable in federal habeas.  *See Estelle* . . .").

Similarly, the federal criminal rules are not binding on the states, and even in
the case of federal convictions, generally cannot be the basis for habeas relief.  *E.g.,*

10

*U. S. v. Timmreck,* 441 U.S. 780, 783-84 (1979) (violation of Federal Criminal Rule

32(a) regarding allocution or Federal Criminal Rule 11 regarding pleas does not

warrant habeas relief); *Warren v. Gartman,* 2008 WL 4697056 at *1 (10th Cir.

2008) (holding as "undoubtedly correct" that "because Rule 11 does not govern

state courts, it cannot be a basis on which to challenge a state conviction") (citing

*Miles v. Dorsey,* 61 F.3d 1459, 1467 (10th Cir. 1995), *cert. denied,* 516 U.S. 1062

(1996)), *cert. denied,* ___ S. Ct. ___, 2009 WL 56540 (2009).  Thus, the claim

based on the Federal Rules should be dismissed.

    The Tenth Circuit has emphasized in several opinions that challenges to

state post-conviction procedures are not cognizable in federal habeas proceedings.

*E.g., United States v. Dago,* 441 F.3d 1238, 1248-49 (10th Cir. 2006) (citing § 2254

decisions of:  *Phillips v. Ferguson,* 182 F.3d 769, 772-73 (10th Cir. 1999); *Sellers v.

Ward,* 135 F.3d 1333, 1339 (10th Cir.), *cert. denied,* 525 U.S. 1024 (1998);

*Hopkinson v. Shillinger,* 866 F.2d 1185, 1219 (10th Cir. 1989), *cert. denied,* 497 U.S.

1010 (1990), *and overruled on other grounds, Sawyer v. Smith,* 497 U.S. 227 (1990));

*see also Jackson v. Ray,* 292 Fed. App'x 737, 740 (10th Cir. 2008) ("We can also

summarily dispose of Mr. Jackson's claim that his state postconviction proceedings

were 'violative of the basic due process clause of the federal constitution and the

decisions therefrom are clearly contrary to the Supreme Court precedent.' . . .

Habeas relief under § 2254 is granted only for errors in the state judgment forming

the basis for incarceration.  If that judgment was proper, there is no ground for

habeas relief based on flaws in state postconviction proceedings.  Thus, claims such

as Mr. Jackson's 'fail to state a federal constitutional claim cognizable in a federal

habeas proceeding.'") (quoting *Steele v. Young,* 11 F.3d 1518, 1524 (10th Cir. 1993)

and citing *Sellers,* 135 F.3d at 1339).  Thus, Silva's challenges to the post-

conviction proceedings should be dismissed.

To the extent that any of these claims raise constitutional claims, they are

discussed below.

## B.  Moot Claims

Two claims assert a constitutional right to "allocution."[5]  "Allocution" is

either a:  "trial judge's formal address to a convicted defendant, asking him or her

to speak in mitigation of the sentence to be imposed [as] required under Fed. R.

---

[5]  *See Doc. 1* at 5 (Claim 4 – "Whether the Judicial Court Judge violated the Petitioner's
First Amendment rights by failure to allow the Petitioner an opportunity to oppose such
enhancements, depriving him of due process and equal protection as grounded in the United
States Constitution . . .  The Petitioner has a *Constitutional right to allocation* (sic) all matters
concerning his faith and liberty.") (emphasis added); *id.* at 9-10 (Claim 8 – "Whether the
prosecution violated the Petitioner's Constitutional rights to due process by not providing the
Petitioner with the information of enhancements on his sentences? . . .  The State never
informed the Petitioner of any such enhancements, therefore violating the Petitioner's *right to
allocution* depriving him of his Due Process rights as protected within the . . . United States
Constitution.") (emphasis added).

Crim. P. 32(c)(3)(C)," or an "unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence." BLACK'S LAW DICTIONARY (8[th] ed. 2004). Aside from the fact that there is no constitutional right to allocution, when Silva received his original sentence, he expressly declined to address the court. *See Sentencing Transcript 9/1/04* at 9 ("MR. BAIAMONTE: . . . I don't believe my client wishes to address the Court. THE DEFENDANT: No, Your Honor."); *Harvey v. Shillinger*, 76 F.3d 1528, 1534 (10th Cir.) ("under federal law, the right to allocution is not constitutionally protected. . . . Rather, it is a right delineated by [Fed.R.Cr.P. 32(c)(3)(C), the violation of which is not subject to collateral attack as unconstitutional. *Hill [v. United States,* 368 U.S. 424, 426(1962)]."), *cert. denied*, 519 U.S. 901 (1996). Therefore, Claims 4 and 8 should be dismissed.

Alternatively, the "allocution" allegations may be part of Silva's other claims that revolve around about the improper sentence "enhancement" originally imposed by the trial judge.[6] Again, allocution is not a constitutional right.

---

[6]  *See id.* at 10-11 (Claim 9 – asserting Equal Protection violation because trial judge did not follow remand orders on sentencing); *id.* at 28-31 (Claim 20 –trial judge failed to recuse from post-conviction proceedings for partiality in violation of Judicial Code of Conduct); *id.* at 30-31 (Claim 21 – asserting trial judge deliberately hindered resentencing).

Furthermore, as discussed in the background section, the original sentence was in fact modified.  Because the habeas relief Petitioner would receive for alleged errors concerning resentencing – elimination of the six-year aggravation sentence – was granted to him prior to instituting these habeas proceedings, Claims 9, 20, and 21 should be found moot.  *E.g., Stratmoen v. Ward,* 248 Fed. App'x 17, 20-21 & n. 2 (10th Cir. 2007) ("The state courts granted him all the relief to which he was entitled for a number of claims, thereby rendering them moot. [and in footnote]  It is unlikely Stratmoen will find himself in another criminal litigation claiming the same errors he alleges here. Therefore, the [capable of repetition but evading review] exception does not apply."); *Duke v. Quarterman,* 2007 WL 316897 at * 1 (N. D. Tex. 2007) ("In his habeas application, petitioner argues he is entitled to early release from confinement to mandatory supervision because his accrued time credits, including flat, good and work time, total the length of his 3-year sentence. On January 17, 2007, petitioner was, in fact, released to mandatory supervision.  As petitioner has been afforded the relief he is seeking by way of this federal habeas application, his petition is moot, mandating its dismissal.").

## B.  Speedy Trial

Silva claims that he was denied a speedy trial and that his attorney was

ineffective with regard to asserting his speedy trial rights.  *See Doc. 1* at 3-4 (Claim 1); *id.* at 11-15 (Claim 10).  The New Mexico Court of Appeals issued a detailed opinion and found no speedy trial violation.  It found that "because the delay here was twenty months and, therefore, presumptively prejudicial," the State had the burden to show the delay did not violate "speedy trial rights."  *Record Proper* at 255-56.  It then discussed the "reasons for the delay," found they were not solely attributable to the State and did not "weigh heavily against either the State or the Defendant."  *Id.* at 256-57.  It next concluded that Defendant did not assert his speedy trial right until "nearly a year and a-half after he was indicted," and thus, "that fact does not weigh heavily in his favor." *Id.* at 257.

The last factor the court discussed was the asserted prejudice due to pretrial incarceration and anxiety.  It concluded that the "most important source of prejudice . . . is impairment to the defense," which Silva did not allege, and there "was no showing [that either pretrial incarceration or anxiety] was unreasonable [thus] we cannot weight them heavily in his favor."  *Id.* at 257.  It concluded:

> Where the delay is presumptively prejudicial, the burden is on the State to show that on balance the factors do not weigh in favor of dismissal.  Here, the State showed that the delay was caused by both Defendant and the State. Additionally, Defendant did not timely assert his right to a speedy trial.  Finally, he was unable to show undue prejudice resulting form the delay.  Weighing these

15

> factors together, we conclude that the was no basis for
> dismissal of the charges.

*Id.* at 258-59.

The *Barker v. Wingo* case sets forth the clearly established Supreme Court precedent for speedy trial claims.  *See Barker v. Wingo,* 407 U.S. 514 (1972); *Jackson v. Ray,* 390 F.3d 1254, 1260 (10th Cir. 2004), *cert. denied,* 546 U.S. 834 (2005). When the delay approaches one year, it is regarded as presumptively prejudicial and thus the four *Barker* factors must be evaluated and weighed.  *E.g., Jackson,* 390 F.3d at 1261.  The four factors are: "(1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether the delay prejudiced the defendant." *Id.* at 1260.  Although the New Mexico Court of Appeals relied exclusively on state decisions in its final opinion, those decisions in turn cite and apply the *Barker* test.  *See State v. Urban,* 135 N.M. 279, 282, 87 P.3d 1061, 1064 (2004); *State v. Coffin,* 128 N.M. 192, 215, 991 P.3d 477, 500 (1999); *Zurla v. State,* 109 N.M. 640, 642, 789 P.3d 588, 590 (1990); *Record Proper* at 255-59 (citing *Urban, Coffin,* and *Zurla*); *Exh. I* at 3 (interim "proposed" decision expressly citing *Barker*).  Thus, the decision is not "contrary to" under AEDPA.  *See  Jackson,* 390 F.3d at 1260  ("The OCCA cited *Stohler,* which refers to the *Barker* . . . test; hence it identified the appropriate legal

16

principles for adjudicating this claim.").

This Court can grant habeas relief only "if there is no possible balancing of
the factors that both supports the [state court's] decision and is not contrary to
clearly established Supreme Court precedent." *Jackson*, 390 F.3d at 1266-67. This
presents a "high hurdle" for Silva because "the Supreme Court made it clear in
*Barker* that the range is very broad indeed." *Simms v. Bravo*, 111 Fed. App'x 552,
554 (10th Cir. 2004). Given the broad range and that no clearly established
Supreme Court decision compels a contrary result, I conclude that the Court of
Appeals decision about the relative weights and balance to give them was not
"unreasonable." *See Jackson*, 390 F.3d at 1267; *Simms*, 111 Fed. Appx at 557.[7]

---

[7] The Court of Appeals did not consider the second defense attorney's assertion of the
right filed at the outset of the proceedings, characterizing it as "*pro forma.*" *Record Proper* at 257.
Instead, only considered the *pro se* motion Silva filed after a year and a half into the proceedings,
characterizing it as "untimely filed" without invoking any procedural rule. *Id.* This apparent
conclusion that Silva waived his right is inconsistent with *Barker*, while not attaching overly-
significant weight to the *pro forma* assertion is consistent with *Barker:*

> We reject, therefore, the rule that a defendant who fails to demand
> a speedy trial forever waives his right. This does not mean,
> however, that the defendant has no responsibility to assert his
> right. We think the better rule is that the defendant's assertion of
> or failure to assert his right to a speedy trial is one of the factors to
> be considered in an inquiry into the deprivation of the right. Such
> a formulation avoids the rigidities of the demand-waiver rule and
> the resulting possible unfairness in its application. It allows the
> trial court to exercise a judicial discretion based on the
> circumstances, including due consideration of any applicable
> formal procedural rule. It would permit, for example, a court to
> attach a different weight to a situation in which the defendant

I recognize that there are *pro se* submissions in the State Record that have

bearing on the question of when Petitioner asserted his right to a speedy trial.

These were attached to the *pro se* petition for a writ of mandamus, which was filed

after the trial judge denied the state habeas petition. *See Record Proper* at 370-448.

Petitioner submitted the same with his federal habeas petition. *See Docs. 1-5, 1-6,*

*1-7, 1-8.* Even if I consider this evidence and analyze the claim *de novo*, the result

is the same.

Beyond determining whether the length of delay was presumptively

prejudicial, "length of delay" is a factor to consider in its own right. Silva was

indicted on September 30, 2002 and trial began June 7, 2004 – a total period of

twenty months plus one week. *See Record Proper* at 2; *Trial Transcript 6/7/04* at 1.

The criminal charges here were "complex," the case began with five co-defendants,

some of whom eventually pleaded guilty and others whose trials were severed from

---

knowingly fails to object from a situation in which his attorney
acquiesces in long delay without adequately informing his client, or
from a situation in which no counsel is appointed.  It would also
allow a court to weigh the frequency and force of the objections as
opposed to attaching significant weight to a purely *pro forma*
objection.

*Barker,* 407 U.S. at 528-29.  Even if the Court of Appeals incorrectly applied one of the *Barker*
factors, that "fact . . . is insufficient to grant habeas relief. . . .  we turn to the balancing of the
*Barker* factors to determine whether the . . . overall decision was objectively unreasonable."
*Jackson,* 390 F.3d at 1266-67.

Silva's.  *See Record Proper* at 43 ("this is a complex case involving the kidnapping

and subsequent repeated stabbing of the alleged victim.  The case involves possible

DNA evidence, 2 separate crime scenes and five (5) co-defendants.  All defense

attorneys are requesting the State to engage in plea negotiations and to tender plea

offers . . . pre-trial interviews have not yet been completed").  In light of the

volume of defendants alone, I find the delay of a little more than eight months

beyond the one-year mark is "tolerable and thus does not weigh heavily against the

[State] in the overall *Barker* analysis."  *United States v. Cone,* 2008 WL 3861201 at

* 4 (10th Cir. 2008) (so holding where total period of delay was eighteen months);

*compare Jackson,* 390 F.3d at 1261 (total period of delay of "four and one-third

years" found to weigh in favor of Petitioner).

　　　The "reason for delay" factor places the burden on the State to explain why

the delay occurred.  *E.g., Jackson,* 390 F.3d at 1261-62 & n.3.

> [D]ifferent weights should be assigned to different
> reasons.  A deliberate attempt to delay the trial in order
> to hamper the defense should be weighted heavily against
> the government.  A more neutral reason such as
> negligence or overcrowded courts should be weighted less
> heavily but nevertheless should be considered since the
> ultimate responsibility for such circumstances must rest
> with the government rather than with the defendant.
> Finally, a valid reason, such as a missing witness, should
> serve to justify appropriate delay.

*Barker,* 407 U.S. at 531.

The record shows that during the course of the twenty months, Silva had three attorneys, two prosecutors, and three judges assigned to his case. The first defense attorney appeared at the arraignment held a few days after the September 30th indictment. *See Record Proper* at 13-14. The second defense attorney entered his appearance some three months later and "assert[ed] [Silva's] right to a speedy trial." *Id.* at 22. Some two months the assertion of the right, the State moved for an extension because "additional discovery has just been provided to the State and the defense and time is needed to review reports, interview witnesses and discuss possible plea options." *Id.* at 25. Immediately after granting the extension, the first-assigned trial judge set the matter for a trial within a few months. *See id.* at 35-36.

The next delay is attributable to Silva. Some six weeks before the trial, Silva's second defense attorney moved to withdraw because of "a conflict of interest between [Silva] and another client [of the attorney's] discovered during the investigation of this matter." *Id.* at 38. The motion was granted, and a public defender substituted. *See id.* at 38-39. The public defender entered an appearance some two weeks later and made a demand for discovery, thus prompting the State to file a second request for an extension, which was granted. *See id.* at 40-58.

Another trial was set, but the State moved a third time for an extension based not only on the latest substitution of counsel for Silva, but also because the prosecutor would be leaving for another job and the case would have to be reassigned. *See id.* at 60, 62-85. The motion was granted, and another trial set, but it did not proceed as scheduled because of Silva's motion to sever his trial from his co-defendants. *See id.* at 85-86, 92-98. Thereafter, a two-month delay ensued while the case was reassigned to other judges upon the retirement of the originally-assigned trial judge. *See id.* at 100-106; *see also id.* at 256. The trial date set after the final judge reassignment held. *See id.* at 107.

With most of the delay attributable to the State for valid reasons and some of the delay attributable to Silva's change in counsel and desire to sever his trial, like the Court of Appeals, I find the this factor weighs against the State but not heavily.

The additional evidence in the federal habeas record demonstrates that Silva and his third attorney disagreed on whether to make a motion on speedy trial grounds and whether such a motion would have been successful. The first instance of Silva seeking to have his speedy trial rights asserted occurred about seven months earlier than the Court of Appeals concluded it had, at the one-year mark

after the indictment.[8]  Thus, I find this factor weighs in favor of Silva but not

heavily.  *See Jackson,* 390 F.3d at 1263 ("in general, the sooner a criminal defendant

raises the speedy trial issue, the more weight this factor lends to his claim.").

The burden of showing particular instances of prejudice rests with Silva.  A

"mere 'possibility of prejudice'" will not suffice.  *See id.,* 390 F.3d at 1264 (quoting

*United States v. Loud Hawk,* 474 U.S. 302, 315 (1986)).  "Impairment of the defense

is the most important interest."  *Id.* (citing *Barker,* 407 U.S. at 532).  However, the

only basis asserted for prejudice in the State proceedings was "oppressive pretrial

---

[8]  *See supra* note 7; *see also, e.g., Record Proper* at 257 ("One [demand for a speedy trial]
was filed *pro se* on March 29, 2004, eighteen months after he was indicted") (citing *id.* at 114);
*Doc. 1-6* at 19-21 (9/26/03 letter from Silva to third attorney stating:  "I would also, at this time,
like to make two formal request[s]: . . . A motion to dismiss [the] entire  . . . case on grounds of
criminal procedure – District Courts 5-604.  'Time of Commencement of trial.'"); *id.* at 22-23
(10/7/03 response by attorney disagreeing that motion to dismiss on speedy trial grounds would
succeed); *id.* at 26 (10/14/03 letter from Silva disagreeing with attorney's assessment of likelihood
of success); *id.* 28-30 (10/21/03 response by attorney re: same); *id.* at 31-32 (10/27/03 letter from
Silva taking issue with part of the reason for State's most recent request for extension); *id.* at 12-
13 (letter from Silva to third attorney dated 2/12/04 stating "is the[re] any reason, why case
should be postponed any further than April 4, 2004, date of the rule [granted by the last
extension]?  One final note; I am and have been ready to go to trial.  Please, no extensions on my
behalf."); *Doc. 1-7* at 2-4 (3/6/04 letter from Silva reasserting desire to file motion to dismiss on
speedy trial grounds and disagreeing with attorney's assessment of success); *id.* at 5 (3/16/04
response by attorney re: same); *id.* at 6-8 (3/24/04 letter from Silva stating:  "it has been revealed
that a failure to assert/demand a speedy-trial on my behalf has occurred . . . .  To me, "it is"
harmful error. . . .  I have submitted to the higher court my objection to any petitions by the state
or you [for extensions]."); *id.* at 9-10 (copy of *pro se* "demand for speedy trial," filed 3/29/04);
*Record Proper* at 108-18 (*pro se* "demand for speedy trial," "objection" to State's request or an
extension, summarizing prior disagreement with counsel on the topic' pro se request to "argue a
Motion to Dismiss for procedural as well as constitutional speedy trial reasons," and State's
response).

incarceration and the anxiety." Silva did not assert otherwise either her or in post-conviction proceedings. *See e.g., Exh. H* at 13; *Record Proper* at 258, 274-75; *Doc. 1* at 3-4, 11-15. "To establish prejudice as a result of anxiety, a defendant must make a particularized and substantial showing of anxiety distinguishable from anxiety suffered by other similarly situated defendants." *United States v. Yehling,* 456 F.3d 1236, 1245 (10th Cir. 2006) (citing *Harris v. Champion,* 15 F.3d 1538, 1565 (10th Cir. 1994)). The same is true for oppressive pretrial incarceration. *Harris,* 15 F.3d at 1565. No such showing has been made here.

The *Barker* factors are not talismanic, and no single factor is "either a necessary or sufficient condition to the finding of a deprivation of the right of a speedy trial." *Barker,* 407 U.S. at 533. On balance, the factors do not tip in Silva's favor, even if I weight the "reasons for the delay" factor "heavily against the State and in Petitioner's favor" as Silva asks. *See Doc. 1* at 4. Accordingly, either under a deferential or *de novo* review, I recommend that the speedy trial claim (Claim 1) be dismissed.

Because there is no Speedy Trial violation, the related ineffective assistance of counsel claim (Claim 2) should be dismissed without further discussion. *E.g., Larson v. Dorsey,* 1993 WL 76278 at * 3 (10th Cir.) ("the magistrate judge correctly ruled that Larson's speedy trial rights were not violated. Accordingly, we agree

with the magistrate judge that denial of the speedy trial claim precludes the

necessity for consideration of Larson's ineffective assistance of counsel claim [based

on failure to assert a Speedy Trial claim]"), *cert. denied,* 510 U.S. 843 (1993).

## C.  Conspiracy

Silva argues that because he was charged with the substantive offense as well

as conspiracy to commit it, he was exposed to a substantially increased sentence in

violation of the Double Jeopardy and Ex Post Facto clauses.  *See Doc. 1* at 21-22

(Claim 14); *id.* at 22-23 (Claim 16).  Neither claim has any merit.

It has long been settled that a substantive crime and a conspiracy to commit

that crime are not the "same offense" for double jeopardy purposes.  This is so

because the "agreement" to commit the crime is "distinct" from committing the

crime itself.  *E.g., United States v. Felix,* 503 U.S. 378, 389-91 (1992); *Pinkerton v.*

*United States,* 328 U.S. 640, 643-44 (1946).  As expressed under the terms of the

Supreme Court's test in *Blockburger,* the "agreement" element for a conspiracy

conviction under one statute is a proof of fact that is not required for a conviction

of the substantive offense under another.

> It is settled that a single illegal transaction may be
> punished under several statutory provisions if conviction
> under each statutory provision requires proof of a fact not
> required for conviction under the other statutory

24

> provisions. *Blockburger v. United States,* 284 U.S. 299,
> 304 (1932). After all, these are separate and distinct
> violations, the conspiracy and the actual carrying out of
> the conspiracy. This double jeopardy test focuses on the
> elements of the crimes, and not on the specific acts
> charged in the indictment of evidence presented at trial.

*Timberlake v. United States,* 767 F.2d 1479, 1481 (10th Cir. 1985).

In New Mexico, kidnapping, aggravated assault, and tampering with

evidence are all distinct crimes with distinct elements of proof. *See* N.M. STAT.

ANN. § 30-4-1 (kidnapping) (LexisNexis 2004 & Supp. 2007); *id.,* § 30-3-2; *id.,* §

30-22-5 (tampering). Likewise, the crime of conspiracy requires proof of another

distinct element – the agreement. Conspiracy "consists of knowingly combining

with another for the purpose of committing a felony within or without this state."

*Id.,* § 30-28-2. "The crime of conspiracy 'is complete when the felonious agreement

is reached.'" *State v. Gonzales,* 145 N.M. 110, ___, 194 P.3d 725, 728 (Ct. App.

2008) (quoting *State v. Johnson,* 136 N.M. 348, 361, 98 P.3d 998, 1011 (2004), *cert.*

*denied,* 543 U.S. 1177 (2005)), *cert. denied,* 145 N.M 257, 194 P.34d 725 (2008).

Thus, there is no "*Blockburger*" double jeopardy issue with Silva having been

indicted under these four different statutes.

Similarly, an Ex Post Facto violation requires that the New Mexico

legislature had retroactively applied a particular law to Silva. That is neither

alleged nor the case here.  *E.g., California Dep't of Corr. v. Morales,* 514 U.S. 499,

505 (1995); *Collins v. Youngblood,* 497 U.S. 37, 43 (1990); *Weaver v. Graham,* 450

U.S. 24, 28 (1981).

Silva also raises a *"Braverman"* sort of double jeopardy claim.  There, the

Supreme Court indicated that:

> when a single agreement to commit one or more
> substantive crimes is evidenced by an overt act . . . the
> precise nature and extent of the conspiracy must be
> determined by reference to the agreement which
> embraces and defines its objects.  Whether the object of a
> single agreement is to commit one or many crimes, it is n
> either case that the agreement which constitutes the
> conspiracy which the statute punishes.  The one
> agreement cannot be taken to be several agreements and
> hence several conspiracies because it envisages the
> violation of several statute rather than one.

*Braverman v. United States,* 317 U.S. 49, 53 (1942).  Thus, whereas the *Blockburger*

test applies to situations where a single course of conduct results in conviction

under two separate statutes, *Braverman* is concerned with the situation where a

single course of conduct results in two separate convictions under one conspiracy

statute.  *E.g., Albernaz v. United States,* 450 U.S. 333, 337-40 (1981).  Silva's second

claim raises the *Braverman* situation by asserting:  "Whether there is *insufficient*

*evidence of a separate and distinct conspiracy* to commit aggravated assault . . .

*that is not subsumed by the charged . . . conspiracy to commit kidnapping . . .*

violating Petitioner's constitutional right against double jeopardy?" *Doc. 1* at 4

(Claim 2) (original capitalization omitted for clarity) (emphasis added).  I find the

claim was fairly presented as a federal claim to the state courts and, regardless of

whether the direct appeal or post-conviction proceeding decision is the operative

decision to consider, the claim is without merit.[9]

　　If I were evaluating this habeas claim *de novo,* I need go no further than

Supreme Court precedent to reject the claim.  *Braverman* is not applicable where,

as here, a defendant is also separately charged and convicted of the substantive

offenses that are the object of the conspiracy.  This is so because more than one

conspiracy is both alleged and proven.  *Braverman* itself distinguished the situation

at bar:

　　　　Where each of the counts of an indictment alleges a

---

[9]　The same claim was cast on direct appeal primarily as an insufficiency of the evidence claim, but also cited state authority that analyzes whether a single agreement violates double jeopardy under *Braverman* and specifically noted that the decision quotes *Braverman.  See Exh. 13-2* at 40 (citing *State v. Ross,* 86 N.M. 212, 214-15, 521 P.2d 1161, 1163-64 (Ct. App. 1974), the place in the opinion where the New Mexico Court of Appeals rejects a state decision as not on point and quotes *Braverman*).  The state habeas petition plainly raised the claim as a federal double jeopardy claim, which was summarily dismissed.  *See Record Proper* at 274, 342; *see also Bland v. Sirmons,* 459 F.3d 999, 1011  (10th Cir. 2006) ("'Fair presentation' requires more than presenting all the facts necessary to support the federal claim to the state court or articulating a somewhat similar state-law claim. . . .  'Fair presentation' means that the petitioner has raised the substance of the federal claim in state court. . . .  The petitioner need not cite book and verse on the federal constitution, . . .  but the petitioner cannot assert entirely different arguments from those raised before the state court.") (internal citations and certain quotations omitted), *cert. denied,* 127 S. Ct. 2117 (2007).

> conspiracy to violate a different penal statute it may be
> proper to conclude, in the absence of a bill of exceptions
> bringing up the evidence, that several conspiracies are
> charged rather than one, and that the conviction is for
> each. . . .  But it is a different matter to hold, as the court
> below appears to have done in this case . . . that even
> though a single agreement is entered into, the
> conspirators are guilty of as many offenses as the
> agreement has criminal objects.

*Braverman,* 317 U.S. at 52-53; *see also, e.g., Albernaz,* 450 U.S. at 338-40; *Sanabria*

*v. United States,* 437 U.S. 54, 73-74 & n. 33 (1978); *American Tobacco Co. v. United*

*States,* 328 U.S. 781, 787-88 (1946); *Pinkerton,* 328 US. at 642-43.  In other words,

no clearly established Supreme Court precedent holds that a conviction for

multiple conspiracies violated double jeopardy where the defendant is also

convicted of the underlying crimes.  All Supreme Court indications are to the

contrary.

The result is the same under the AEDPA standard of review, though for

more complicated reasons.  I will not detail all the intricacies.  Suffice it to say that,

under federal law, the Supreme Court applies a "congressional intent" test to

determine whether multiple convictions under the same statute for a single course

of conduct comports with double jeopardy principles.  That is, what is the allowable

"unit of prosecution" that the legislature intended for conspiracies? *E.g., Sanabria,*

437 U.S. at 69-70 & n. 24 (and Supreme Court cases cited therein).  Although

New Mexico double jeopardy protection is broader than federal law in some respects, *e.g., State v. Rodriguez,* 138 N.M. 21, 116 P.3d 92 (2005); *State v. Nunez,* 129 N.M. 63, 2 P.3d 264 (1999); in the *Blockberger* and *Braverman* situations New Mexico adheres to the federal standards, *see Swafford v. State,* 112 N.M. 3, 7-9, 13-14, 810 P.2d 1223, 1227-29, 1233-34 (1991); *see also, e.g, State v. Saiz,* 144 N.M. 663, ___, 191 P.3d 521, 528 (2008).  The New Mexico Court of Appeals has already concluded that the New Mexico legislature intended to punish only one conspiracy under § 30-28-2.  *State v. Jackson,* 116 N.M. 130, 134, 860 P.2d 772, 776 (Ct. App.) ("Neither party argues, nor do we believe, that the legislature intended to impose multiple punishments for one conspiracy."), *cert. denied,* 115 N.M. 795, 858 P.2d 1274 (1993).  Nevertheless, "different" and "distinct" conspiracies can be punished.  *See id.* at 133-34, 860 P.2d at 775-76 (and cases cited therein).  The New Mexico Court of Appeals did not revisit the conclusion in *Jackson,* and issued its decision based on whether more than one conspiracy existed.  It found two, based on the two different crimes committed.[10]  Since this approach is not

---

[10]     As we have often pointed out, the determination of the number of conspiracies is a fact question that we review for sufficient evidence.  *State v. Sanders,* 117 N.M. 452, 457, 872 P.2d 870, 875 ([Ct. App.] 1994). Here, Defendant argues . . . that any agreement to commit aggravated assault was simply that part of the kidnaping charge that required the use of force or intimidation.  We disagree. The evidence here established that Defendant and others

inconsistent with the reason why the Supreme Court distinguishes *Braverman,* I

cannot say that the result is "contrary to" or "unreasonable." *Compare Haji v.*

*Miller,* 584 F. Supp.2d 498 (E.D.N.Y. 2008) (double jeopardy violation found in

case where court did not discuss *Braverman* inapplicability and where it was not

clear from facts whether defendants were charged with underlying crimes as well as

conspiracy).  Accordingly, I recommend that Claims 2, 14, and 16 be dismissed.

## D.  *Evidence Of Motorcycle Gangs*

In Claim 5, Silva asserts that a mistrial was warranted because of the trial

judge's actions with respect to motorcycle gang references.  Evidently, the claim is

based on what Silva extrapolates from post-trial correspondence he had with his

---

in a group that the victim had been doing "meth" with, thought
that the victim was a rat. . . .  The victim was tied to a chair while
a number of phone calls were made allegedly checking her
background. . . .  During that time, Defendant threatened her with
a gun. . . .  We believe that the force and intimidation necessary for
kidnaping were present during the time that the victim was
restrained in the house.

Defendant called [a co-defendant] to come take the victim
away. . . .  The victim testified that [the co-defendant] said he had
been looking for her for months. . . .   She testified that she knew
she was going to die and she did not beg for her life. . . .  [The co-
defendant] drove her to the mountains, where he cut her throat
and stabbed her in the neck. . . .  This is evidence of a different
agreement to assault the victim.  Thus, we conclude that there was
sufficient evidence to support both a conspiracy to commit
kidnaping and a conspiracy to commit aggravated assault.

*Record Proper* at 253-54 (certain internal punctuation and citations omitted; original spelling of
"kidnapping" retained).

attorney, and not the actual transcripts.  *See Doc. 1* at 6-7.  Indeed, the factual premises for the claim are mistaken.

Silva asserts that although his attorney successfully argued a "motion in limine" before voir dire, the trial judge violated his own ruling by introducing the topic of "gang activity during voir dire examination."  *Doc. 1* at 6; *see also id.* at 7. This is not what happened at the hearing prior to voir dire.  The fact that Silva was involved in a motorcycle gang *shoot out* between the Banditos and Hells Angels one week prior to meeting the victim was not to be mentioned at trial.  On the other hand, the fact that the victim told police that Silva drove a "stolen Harley," any speculation that Silva kidnapped and tried to have the victim killed because of a connection to the Hells Angels, and the telephone conversation she overheard mentioning those gangs, was *not* excluded.  *See Trial Transcript 9/7/04* at 2-6, 12.

The trial judge also denied defense counsel's request to instruct the jury that Silva was not a member of either motorcycle gang.  *Id.* at 6-7.  Nevertheless, although the actual voir dire was not transcribed, it was plain from the judge's remarks that he intended to try and minimize the effect of any references to "Banditos" or "Hell's Angels."  *See id.* at 6 ("I know that the mention of those two gangs is going to be something that's going to be important to this jury, but from what I know about the case, I don't think there's any way I can clean it up by

31

having those things [i.e., names] not mentioned.  So I'm not going to exclude mention of those things.  I will try to address that to some extent in the mention of – in voir dire.").

Silva also asserts that when the victim testified in rebuttal, she stated the trial judge "coached her on 'what not to say,'" suggesting that he overreached and acted inappropriately.  *Doc. 1* at 6.  Again, that is not what happened.  During the trial judge's initial statement to the petit jury, he did not mention motorcycle gangs either in general or by name, how the victim knew Silva, or what transportation he used.  Neither did the prosecutor.  The defense reserved opening until after the close of the State's case.  *Trial Transcript 9/7/04* at 14-25.

Likewise, at no point on direct, cross-examination, or re-direct did the attorneys or the victim mention or suggest anything a shoot out, her affiliation with the Hell's Angels, the Bandito's or Hell's Angels, any motorcycle gang, or her beliefs about Silva's motive.  *See id.* at 26-78.  The only thing she mentioned is that she heard Silva ride up on his Harley, but did not mention that it was stolen.  *Id.* at 31-32.

It was defense counsel who introduced the subject of the shoot out between the Banditos and the victim's affiliation with the Hell's Angels.  He did so during opening statement after the State rested its case, foreshadowing for the jury Silva's

testimony – the only defense witness.  *Trial Transcript 6/8/04* at 43-45.  Silva

followed suit with the details during his testimony.  *See id.* at 45-78.  When the

State called the victim in rebuttal it asked her whether she was affiliated with the

Hell's Angels as Silva testified (which she denied), and why she had not mentioned

the shoot out, she replied:

> A.  I was asked not to speak about it.
> Q.  Who told you?
> A.  The Judge.

*Id.* at 81.

Silva also asserts that the reason why he testified about the shoot out and

motorcycle gangs was because he had to "explain away" the trial judge's reference

to motorcycle "gang activity" during voir dire.  *Doc. 1* at 6.  The assertion is

fantastical, given his defense testimony that, prior to the events in question, he

feared for his life from motorcycle gangs, met the victim and became intimate with

her when she hid him from the danger, and discharged his weapon and left the

house before the victim was tied up because there were people with the victim who

he did not know and he was scared.  *Trial Transcript 6/8/04* at 43-65.

## E.  *Remaining Ineffective Assistance of Counsel Claims*

To prevail on an ineffective assistance of counsel claim, Silva must show: (1)

counsel's performance was deficient; and (2) counsel's deficient performance prejudiced him.  *See Strickland,* 466 U.S. at 687 689, 697.  Failure to meet either prong defeats an ineffectiveness claim, and if it is easier to dispose of a claim on the prejudice prong, that is the course the court should follow.  *E.g. Smith v. Robbins,* 528 U.S. 259, 286-87 & n.14 (2000).

In Claim 12, Silva argues that his trial attorney failed to produce the "record proper" on appeal, which the Court of Appeals noted in an order.  *See Doc. 1* at 19-20.  There is utterly no prejudice from counsel's initial failure, since the record was subsequently made available to the Court of Appeals.  *See Record Proper* at 226-27 (order for trial counsel to show cause for failure to file the record proper); *id.* at 228-31 (first proposed summary disposition citing to record proper); *id.* at 232-36 (second summary disposition citing to record proper); *id.* at 252-60 (memorandum opinion citing to record proper).

In Claims 7 and 11, Silva asserts that his appointed attorney labored under a "conflict of interest" because he was reimbursed for his services by the State.  *See Doc. 1* at 9, 15-19.  This claim was raised in the state habeas proceedings and summarily denied.  *See Record Proper* at 274 (Ground 5); *id.* at 342 (summary denial).  The state court's result is neither "contrary to" nor "unreasonable."

Foremost, the Supreme Court has never held that governmental

34

reimbursement for appointed counsel violates the Sixth Amendment.  Indeed, an

indigent defendant's right to an appointed attorney, who is necessarily reimbursed

by a governmental entity, is part of the Sixth Amendment guarantee.  "[A] mere

theoretical division of loyalties," will not suffice.  *Mickens v. Taylor,* 535 U.S. 162,

171 (2002).  Other courts have flatly rejected the argument that public defenders

are conflicted because of how they are paid, and I am persuaded that these cases

reach the correct result.[11]  Furthermore, the required showing of prejudice is not

---

[11]   *Tamez v. Director, TDCJ-CID,* 550 F. Supp. 2d 639, 642-43 (E.D. Tex. 2008)
("Although Tamez says that Law had a "conflict of interest," he has not pointed to any facts
which show that Law either had or demonstrated any loyalty to the Texas Department of
Criminal Justice rather than to him. Similar arguments-for example, that public defenders have a
conflict of interest because they are paid by the State-have been rejected by the courts.  *See, e.g.,*
*Pasillas-Martinez v. U.S.,* No. EP-05-0152-DB, 2005 WL 1397012 (W.D.Tex., June 2, 2005)
(unpublished) (available on WESTLAW at 2005 WL 1397012) (rejecting claim of conflict of
interest because public defender paid by United States just like the U.S. Attorney is), citing
*Mickens v. Taylor,* 535 U.S. 162, 165-66 . . . .  *Mickens* held that until the defendant shows that
counsel "actively represented conflicting interests," he has not established a constitutional
predicate for his claim of ineffective assistance.  Here, Tamez has not shown that Law actively
represented conflicting interests, and so his claim on this point is without merit.");  *Mooney v.*
*Trombley,* 2007 WL 2331881 at **16-18  (E.D. Mich.2007) ("Petitioner first contends that his
counsel was per se ineffective because counsel had a contract with the trial court which paid
counsel $590.00 per case, regardless of the amount of time spent on the case.  Because counsel
spent in excess of 100 hours on the case, he made less than $6.00 per hour, contrary to his
normal billing rate of $150.00 per hour, and to the rates of $75.00 and $90.00 per hour in other
local courts.  Petitioner contends that the fee system created a constructive absence of counsel
under *United States v. Cronic,* . . . such that a showing of prejudice with respect to his ineffective
assistance of counsel claims is not necessary.  The Court should disagree.  Petitioner has pointed
to no clearly established Supreme Court precedent requiring application of the presumed
prejudice standard in the circumstances present here. . . .  The Supreme Court has recently
explained, however, that for an ineffective assistance claim to come within this limited exception
to *Strickland,* 'the attorney's failure must be complete.'  *Bell v. Cone,* 535 U.S. 685, 697 (2002).");
*United States v. Sweeney,* 2006 WL 2864709 at * 4 (D. Conn. 2006) ("Petitioner argues that there
is an inherent conflict of interest where a public defender is paid by the government because

excused when the claim is that counsel's financial interests are the basis for the alleged conflict.  *See id.* at 174-75.  It is true that in the *Wood* case the Supreme Court remanded where an employer's attorney represented the defendants in a case where a favorable decision would have impacted potential fines the employer might have to pay.  *See Wood v. Georgia,* 450 U.S. 251 (1981).  However, as it explained in *Mickens,* the *Wood* remand was not because the Court found an actual conflict and automatically presumed prejudice – it was "[b]ecause on the record before us, we could not be sure whether counsel was influenced in his basic strategic decisions by the interest of the employer who hired him."  *Mickens,* 535 U.S. at 170 (original quotations and supplied material marks omitted).  Here, however, there is utterly no showing of any prejudice.  Accordingly, Claims 7 and 11 should be dismissed.

Wherefore,

IT IS HEREBY RECOMMENDED THAT:

1. Respondents' Motion To Dismiss *(Doc. 23)* be GRANTED:

2. The § 2254 petition *(Doc. 1)* be DENIED; and

---

"there is no incentive for the attorney to pursue a vigorous defense for the defendant."  Petition at ¶ 12.  The Second Circuit has held with respect to the State of Connecticut's public defender system "that even though the Public Defender is appointed by the same judges who will hear the cases in which he participates, and even though those same judges fix the Public Defender's salary and term of office, the system is not violative of due process."  *United States ex rel. Reid v. Richmond,* 277 F.2d 702, 703 (2nd Cir. 1960).  The same reasoning applies to the federal defender system.").

3.  This action be dismissed with prejudice.


_____
UNITED STATES MAGISTRATE JUDGE